In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 24-2275

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

STEVEN DORFMAN,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:22-cr-30024 — **Stephen P. McGlynn**, *Judge.*

———————————

ARGUED DECEMBER 10, 2025 — DECIDED JULY 27, 2026

———————————

Before BRENNAN, *Chief Judge*, and LEE and KOLAR, *Circuit Judges*.

LEE, *Circuit Judge*. Steven Dorfman was the owner and Chief Executive Officer of a telemarketing company that sold limited indemnity healthcare insurance plans over the phone. These plans offered a significantly lower level of benefits than traditional healthcare plans. As CEO, Dorfman directed his sales employees to follow a script containing misleading half-truths and omissions to induce customers into buying the

plans. Along with two fellow executives, Dorfman was indicted for conspiracy to commit wire fraud, wire fraud, and mail fraud. After a jury convicted him of all counts, Dorfman seeks to vacate his conviction on numerous grounds. Finding no reversible error, we affirm.

## I. Background

Dorfman was the owner and CEO of a telemarketing company, Simple Health. The company sold limited indemnity plans over the telephone on behalf of Health Insurance Innovations ("HII"), which administered the plans.

Limited indemnity plans are designed to supplement—not replace—traditional forms of medical insurance. As a result, they differ from traditional plans in several significant ways. Unlike traditional plans, for example, limited indemnity plans pay only fixed amounts when an insured incurs certain health expenses, and they are not legally mandated to cover prescription drugs or any specific types of treatment. Perhaps most significantly, limited indemnity plans do not provide a ceiling on a plan holder's out-of-pocket costs. As a result, the customer bears the risk of large medical bills (beyond the fixed amount provided by the plan). These plans are not governed by the Affordable Care Act ("ACA") and do not satisfy the ACA's individual mandate.

According to the government, Dorfman, along with John Sand (Simple Health's Vice President overseeing sales and the call center) and Cameron Girouard (the company's Chief Financial Officer), ordered sales employees to use a deceptive script to sell HII's limited indemnity plans over the telephone. The scripts were deceptive and misleading, the government alleged, because they led customers to believe that the HII

plans provided substantially greater benefits than they actually did.

Dorfman, Sand, and Girouard were charged with conspiracy to commit fraud in violation of 18 U.S.C. § 1349 (Count 1);[1] wire fraud in violation of 18 U.S.C. § 1343 (Counts 2, 3, 4, 5, 6, 7, 10, 13);[2] and mail fraud in violation of 18 U.S.C. § 1341 (Counts 8, 9, 11, 12).[3]

---

[1] Section 1349 of Title 18 provides, "Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

[2] Section 1343 of Title 18, provides in relevant part,

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

[3] Section 1341 of Title 18, provides in relevant part,

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office … any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

Girouard pleaded guilty and testified against Dorfman and Sand, who were tried together. Following an 11-day trial, the jury found Dorfman and Sand guilty on all counts. Dorfman filed a motion for judgment of acquittal or, in the alternative, for a new trial, which the district court denied. He was subsequently sentenced to 300 months of imprisonment as to Count 1 and 240 months of imprisonment for each of Counts 2 through 13, all terms to be served concurrently. Dorfman appeals, arguing that the district court committed various errors that entitle him to a new trial.

## II. Discussion

### A. Jury Instruction on "Scheme to Defraud"

We begin with Dorfman's challenge to the district court's instruction defining "scheme to defraud" for the jury. We review *de novo* whether a jury instruction fairly and accurately summarizes the law. *United States v. Carrazco-Martinez*, 166 F.4th 672, 678 (7th Cir. 2026) (citation omitted). "If it does, we examine the district court's particular phrasing of the instruction for abuse of discretion and we will reverse only if it appears both that the jury was misled and that the instructions prejudiced the defendant." *Id.* at 678–79 (citation modified).

The government asked the district court for a jury instruction similar to one found in *United States v. Woods*, 335 F.3d 993, 997–98 (9th Cir. 2003). The district court agreed and defined "scheme to defraud" as follows:

In determining whether a scheme to defraud exists, you are entitled to consider not only the defendants' words and statements, but also the circumstances in which they are used as a whole.

> A defendant's actions can constitute a scheme to de-
> fraud even if there are no specific false statements in-
> volved. The deception need not be premised upon
> words or statements standing alone. The arrangement
> of the words or the circumstances in which they are
> used may create an appearance which is false or decep-
> tive, even if the words themselves fall short of this.
> Thus, even if statements as part of the scheme are not
> literally false, you may consider whether the state-
> ments taken as a whole were misleading and decep-
> tive. Evidence beyond a reasonable doubt that a
> scheme was reasonably calculated to deceive is suffi-
> cient to establish a scheme to defraud.

Dkt. 139 at 28.[4]

Dorfman insists that the instruction misstates the law in
two related ways. First, he argues that the federal mail and
wire fraud statutes require a defendant to have made state-
ments that were expressly false; "misleading and deceptive"
statements alone are insufficient to establish a scheme to de-
fraud. Second, Dorfman contends that a scheme to defraud
cannot consist solely of "[t]he arrangement of [ ] words or the
circumstances in which they are used" that create "an appear-
ance which is false or deceptive" even if the words themselves
are not false or deceptive.

### 1. Misleading and Deceptive Statements

To determine whether the federal wire fraud and mail
fraud statutes require a statement to be actually false, we
begin with the statutes' text. *See Bartenwerfer v. Buckley*, 598

---

[4] "Dkt." refers to the docket number in the district court record.

U.S. 69, 74 (2023). A defendant commits wire fraud when he executes "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."[5] 18 U.S.C. § 1343. Similarly, a defendant commits mail fraud when he devises or attempts to devise "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1341. We construe the identical language in the wire and mail fraud statutes "*in pari materia*." *Kousisis*, 605 U.S. at 121 n.2 (internal quotation marks omitted).

The text of these provisions demonstrates that a scheme or artifice to defraud does not require actual falsity, as Dorfman contends. The statute requires "false *or* fraudulent pretenses, representations, or promises." (emphasis added). The ordinary use of "or" is "almost always disjunctive, that is, the words it connects are to be given separate meanings." *Loughrin v. United States*, 573 U.S. 351, 357 (2014) (quoting *United States v. Woods*, 571 U.S. 31, 45 (2013)). Thus, "or fraudulent" means something different from "false," otherwise the words "or fraudulent" would be read out of the statutes, something that we are loath to do. *Atl. Richfield Co. v. Christian*, 590 U.S. 1, 31 n.3 (2020) ("[T]he Court usually seeks to avoid a reading which renders some words altogether redundant.") (internal quotation marks omitted).

What is more, the breadth of the wire and mail fraud statutes is evident in the use of the term "fraudulent," "a para-

---

[5] "Despite the use of the disjunctive 'or,' we have declined to interpret § 1343 as establishing alternative pathways to a conviction." *Kousisis v. United States*, 605 U.S. 114, 121 (2025).

digmatic example of a statutory term that incorporates [its] common-law meaning." *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 187 (2016) (citing *Neder v. United States*, 527 U.S. 1 (1999)). At common law, the term "fraud" (and its variations) is "a term with expansive reach," *Kousisis*, 605 U.S. at 124, that "include[s] more than just claims containing express falsehoods," *Universal Health Servs.*, 579 U.S. at 187. It has "long encompassed certain misrepresentations by omission," *id.*, as well as "misrepresentations of material fact," *Neder*, 527 U.S. at 22 (citation modified); *see Chiarella v. United States*, 445 U.S. 222, 227–28 (1980) ("At common law, misrepresentation made for the purpose of inducing reliance upon the false statement is fraudulent.").

Indeed, as the Supreme Court has recognized, the federal mail fraud statute "reache[s] false promises and misrepresentations." *McNally v. United States*, 483 U.S. 350, 359 (1987). And "[a] statement that misleadingly omits critical facts is a misrepresentation." *Universal Health Servs.*, 579 U.S. at 191.

Likewise, numerous circuit courts have held that misrepresentations based on half-truths or omissions fall within the ambit of the wire and mail fraud statutes. *See United States v. Pacilio*, 85 F.4th 450, 462 (7th Cir. 2023); *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1283 (10th Cir. 2023); *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1122 (D.C. Cir. 2009); *United States v. Gillion*, 704 F.3d 284, 296 (4th Cir. 2012). Thus, a misrepresentation does not require express falsity, as Dorfman contends. In fact, the Supreme Court in *Thompson v. United States*, a case upon which Dorfman heavily relies, makes this very point, observing that "misleading statement[s] can be true." 604 U.S. 408, 413 (2025).

Accordingly, the district court's instruction that "even if statements as part of the scheme are not literally false, you may consider whether the statements taken as a whole were misleading and deceptive" is a correct recitation of the law.

Dorfman's remaining arguments are equally unpersuasive. He leans on *Thompson*, but that case involved 18 U.S.C. § 1014, which criminalizes "knowingly mak[ing] any false statement or report," 604 U.S. at 413, and says nothing about fraudulent pretenses, statements, or promises. Likewise, his reliance on 18 U.S.C. § 1027 is misplaced; that provision proscribes "false statement[s] or representation[s] of fact" as well as the knowing concealment or omission of certain material facts. Nothing about this language indicates, as Dorfman argues, that falsity is required in the federal wire and mail fraud statutes. Lastly, Dorfman points to 18 U.S.C. §§ 1001 and 1035, which criminalize a defendant's "conceal[ing], or cover[ing] up" a material fact. The lack of such language in the mail and wire fraud statutes, he posits, means that they exclude such conduct. But like the mail and wire fraud statutes, §§ 1001 and 1035 also criminalize "mak[ing] any … fraudulent statements or representations," undermining Dorfman's argument. *See* 18 U.S.C. §§ 1001(a)(2), 1035(a)(2).

### 2. False or Deceptive "Appearance"

Next, Dorfman objects to the court's instruction that "[t]he deception [for a scheme to defraud] need not be premised upon words or statements standing alone." Dkt. 139 at 28. "The arrangement of the words or the circumstances in which they are used," the court continued, "may create an appearance which is false or deceptive, even if the words themselves fall short of this." These statements taken together, Dorfman insists, misstate the law.

Sections 1341 and 1343 criminalize "any scheme … to defraud … by means of false *or* fraudulent *pretenses*, *representations*, or *promises*." (emphases added). "Fraudulent pretense," construed broadly, might encompass "false appearances." After all, at the time of their enactment, the definitions of "pretense" included a "deception by showing what is unreal and concealing what is real" and a "false show." Webster's Second New International Dictionary 1959 (1958). But it is not obvious from the statutory text that the phrase "fraudulent pretenses, representations, and promises" would include the "appearance of falsity" created by otherwise truthful, non-deceptive words.

We must remember, however, that even if these two isolated sentences were incorrect, "we will reverse only if the instructions, when viewed in their entirety, so misguided the jury that they led to appellant's prejudice." *United States v. Quintero*, 618 F.3d 746, 753 (7th Cir. 2010) (citation omitted). Viewing the jury instructions as a whole, we do not believe that the sentences in question were enough to prejudice Dorfman by confusing or misleading the jury. *See United States v. Clark*, 140 F.4th 395, 413 (7th Cir. 2025).

First, as part of the jury instructions, the district court informed the jury that it must find beyond a reasonable doubt that "[t]he scheme to defraud involved a materially false or fraudulent pretense, representation, or promise." Dkt. 139 at 25. It also told the jury that "a scheme to defraud is a scheme that is intended to deceive or cheat another and to obtain money or property or cause the potential loss of money or property to another by means of materially false or fraudulent pretenses, representations or promises" and that "[a] materially false or fraudulent pretense, representation, or promise

may be accomplished by an omission or the concealment of material information." *Id.* at 27. Additionally, the court defined what it means for a statement or omission to be "material" and for Dorfman to act with "intent to defraud." *Id.* at 30–31. And, even in the instruction Dorfman contests, the district court's recitation of the law was largely correct. The law allows the jury to consider the circumstances in which the defendants' words and statements were used, and the defendants' actions "can constitute a scheme to defraud even if there are no specific false statements involved."

Dorfman's conduct, as depicted by the trial evidence, falls comfortably within these sound instructions. Girouard testified that she agreed with Dorfman and Sand to engage in "deceptive sales practices" so that "[c]onsumers on the phone would be deceived with the scripts that were read." Dkt. 171 at 13. She added that, even though the scripts were technically true, they were designed to create the false impression that the limited benefit plans sold by Simple Health covered more medical services and paid larger portions of the customers' medical bills than they actually did. Furthermore, a Simple Health sales manager testified that HII expressed concern that the company's sales script omitted specific references to the limited indemnity plan's maximum benefits and falsely stated that the plans had "no limits" that would result in savings of "70%" or "up to 70%."

Dorfman himself had been told many times by Girouard that the sales scripts elided material facts, such as the plan's lack of an out-of-pocket maximum. And he was aware of HII's objection to the claim that the plans would save customers "up to 70%." Moreover, Dorfman had the final say over the script's content and knew that, when HII representatives

came to Simple Health, they were shown an HII-approved script that was different from the one that Dorfman had approved for use. *See* Dkt. 172 at 145; Gov't Ex. 449 (notifying Dorfman that the reason a different script was being used was that HII was visiting).

The trial evidence also shows that the materiality of the false statements and omissions were not lost on Dorfman. The daily reports he received about the number of customers cancelling their plans routinely indicated that customers felt misled about the scope of the plan's benefits. This was confirmed at trial by victims who testified that they were deceived into believing that the limited indemnity plans provided much more than they actually did.

As the jury instructions correctly explained, such material falsehoods and omissions fall within the heartland of the fraudulent activities the wire and mail fraud statutes prohibit. Accordingly, we do not believe that the two statements Dorfman highlights were sufficient to mislead or confuse the jury into convicting him of innocent conduct.

**B. Exhibit 10**

After closing arguments, the district court provided the jury with a number of trial exhibits for use in its deliberations. Among them was Exhibit 10—a two-hour video of a training session Dorfman conducted for Simple Health's salesforce. According to Dorfman, providing Exhibit 10 to the jury was prejudicial error, because (1) it was never admitted in evidence, and (2) even if it were admitted, the exhibit was never discussed by a witness or shown to the jury during the trial. Because Dorfman raised the first objection (albeit, briefly) in his motion for a new trial, we review the district court's ad-

mission of Exhibit 10 for abuse of discretion. *United States v. Edwards*, 161 F.4th 1033, 1099 (7th Cir. 2025). As for the second objection, because he raises this argument for the first time on appeal, we review the district court's decision for plain error. *United States v. Mikulski*, 35 F.4th 1074, 1077 (7th Cir. 2022).

On the fourth day of trial, Federal Trade Commission Investigator Roberto Menjivar testified that some of Simple Health's computers were inventoried and that he had participated in a review of the images they contained. At this point, the prosecutor announced in open court:

> I'm going to read … Stipulation Number 2. The government exhibits listed below are true and correct copies of documents, presentations, and recordings that were forensically extracted from computers and servers identified below. These documents are business records of Simple Health. These records were prepared by employees of Simple Health, who had a business duty to create the records. These records were prepared in the ordinary and usual course of Simple Health's regularly conducted business activities, and it was the regular practice of Simple Health to keep such records. And then specifically I'm going to be referring to Government's 5, 6, and 7, 9, 10, and 12. And for the witness only, if we could pull up Exhibit Number 5.

Dkt. 159 at 152. The prosecutor and Menjivar then discussed Exhibit 5.

Just as the prosecutor was moving to Exhibit 6, Matthew Radefeld (Sand's attorney) interjected, "[I]f I may, if we've already stipulated to Exhibits 5, 6, and 7, just not object to their admission and move along from here." *Id.* at 153. The district

court replied, "Yeah," and the prosecutor stated, "I'll move those exhibits, Your Honor, and if they're admitted, that will complete my examination." *Id.* The district court replied, "All right. They're admitted." *Id.* Defense counsel did not object to the admission of Exhibit 10 at the time. Moreover, the district court later entered a minute order indicating that Exhibit 10 was one of the exhibits that had been admitted in evidence that day, and again defense counsel offered no objection.

Ultimately, Exhibit 10 was never used at the trial or published to the jury. The exhibit, however, was provided to the jury during their deliberations, and one juror apparently told Dorfman's counsel after the trial that the exhibit had impacted the jury's verdict. Thus, we are faced with two questions. First, did the district court abuse its discretion when deeming Exhibit 10 admitted as evidence? Second, did the district court plainly err when providing the exhibit to the jury even though it had not been used during the trial?

The first question is answered by the record. The prosecutor stated that he was reading a stipulation into the record whereby the parties agreed to the foundational facts to admit various exhibits, including Exhibit 10. He then moved the exhibits in evidence, and no one objected. Nor did anyone object when the district court later included Exhibit 10 as an exhibit admitted in evidence. Based on this record, the district court did not abuse its discretion by admitting Exhibit 10 in evidence.

The second question—whether the district court erred by providing the jury with an exhibit that was formally admitted in evidence but not used during the trial—is a closer call. As a general matter, "[t]he district court has broad discretion when considering what evidence to permit in the deliberation

room when exhibits are properly admitted at trial." *United States v. Marchan*, 935 F.3d 540, 548 (7th Cir. 2019) (citing *United States v. Biggs*, 491 F.3d 616, 623 (7th Cir. 2007)). Such discretion includes excluding exhibits that neither party relied on, that are not relevant to the issues in the case, or that are cumulative, prejudicial, confusing, or misleading. *See Deicher v. City of Evansville*, 545 F.3d 537, 542 (7th Cir. 2008).

We must be mindful, however, that in criminal proceedings, this discretion is circumscribed by a defendant's constitutional rights. In *Turner v. Louisiana*, for example, the Supreme Court explained that "[t]he requirement that a jury's verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury." 379 U.S. 466, 472 (1965). "In the constitutional sense," the Supreme Court continued, "trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Id.* at 472–73. And, as we have recognized, "[t]he corollary of this is that the jury, in reaching its verdict, has a duty to consider only that evidence which is presented in open court, and not that which comes from outside sources." *United States v. Neff*, 10 F.3d 1321, 1326 (7th Cir. 1993).

As noted, because Dorfman did not make this argument to the district court, we review the court's decision to provide Exhibit 10 to the jury for plain error. Under plain error review, "we ask (1) did the district court err, (2) was the error plain, (3) did it affect [the defendant's] substantial rights, and (4) did it seriously affect the fairness, integrity, or public reputation

of the proceedings?" *United States v. Coleman*, 138 F.4th 489, 500 (7th Cir. 2025) (citations omitted). For an error to affect substantial rights, it must be prejudicial, "which means that there must be a reasonable probability that the error affected the outcome of the trial." *United States v. Marcus*, 560 U.S. 258, 262 (2010) (citation omitted).

Neither party presented Exhibit 10 to a witness at trial, nor was the exhibit published to the jury. But the prosecutor did offer Exhibit 10 in evidence during the trial, and Dorfman had an opportunity to object to its admission (even if he failed to do so). Whether this would satisfy Dorfman's constitutional right of confrontation, cross-examination, and a fair trial is unclear. Nor have the parties adequately addressed this issue in their briefs. Given the record here and the lack of clear authority, we conclude that the district court's decision to provide Exhibit 10 to the jury does not rise to plain error.

That said, even assuming that the district court's decision to provide the jury with Exhibit 10 was error and the error was plain, Dorfman has not shown "a reasonable probability that the error affected the outcome of the trial." *Marcus*, 560 U.S. at 262 (citation omitted). On the one hand, Dorfman is correct that many of his statements captured on the video are inculpatory. For example, it shows Dorfman telling the new employees that he was a "puppeteer" and that the customers were "puppets" and "mostly stupid." Gov't Ex. 10 at 38:00, 1:49:10. Dorfman also tells the salespeople to emphasize that the savings will be "up to" 70%, even if it will actually be less, because "[w]e know the truth behind it." *Id.* at 1:10:26.

But the video contains many exculpatory statements as well. At one point, Dorfman states that the goal for his company is to "provide superior customer satisfaction to create

long lasting relationships with [his] customers." *Id.* at 3:52. When a trainee states that he can tell a customer that the plan will take off "70%" of the cost, Dorfman corrects him, explaining that employees must not forget the "up to" language because of "the law." *Id.* at 1:06:30. "But you have to legally put that 'up to' on there," he explained, "otherwise you're lying and that's one thing that we don't do here. We don't lie. … We always keep it honest." *Id.* at 1:07:29.

Furthermore, much of the facts in the video were cumulative; the record is replete with other evidence of Dorfman's knowing and active role in perpetrating the fraudulent scheme. For instance, the government presented evidence that Dorfman knew that many customers were calling to complain (sometimes through tears) that the plan did not cover their high medical bills, contrary to what they had been told. Gov't Ex. 335. Girouard testified that he informed Dorfman on numerous occasions that the scripts left out important facts, such as the plan's lack of an out-of-pocket maximum. And, according to Kirschner Alteme, a sales manager for Simple Health, it was Dorfman who had approved the "no limits" and "up to 70%" language in sales scripts, and he received daily cancellation reports of customers who complained that they had been deceived. The trial evidence also showed that Dorfman changed the sales scripts whenever HII representatives visited the offices. This is more than enough evidence for a reasonable jury to conclude that Dorfman committed mail and wire fraud and conspiracy to commit fraud.

For all of these reasons, Dorfman has failed to demonstrate that the district court's decision to provide Exhibit 10 to the jury was plainly erroneous.

## C. Constructive Amendment and Unanimity Instruction

Dorfman's final two arguments challenge what he describes as a second scheme introduced at trial. As he sees it, the indictment charged him with one scheme—defrauding his customers—but at trial, the government also presented evidence of a different scheme—defrauding regulators. This, he argues, amounted to a constructive amendment of the indictment in violation of his constitutional rights. On top of this, he adds, because the government alleged two different schemes, the district court should have provided the jury with a specific unanimity instruction to ensure that the jury unanimously finds him guilty of the same scheme. *See United States v. Davis*, 471 F.3d 783, 791 (7th Cir. 2006) (explaining that a specific unanimity instruction should be given where the indictment alleges multiple schemes so that a jury is aware that it must be unanimous on at least one of the schemes). Because Dorfman failed to raise these arguments below, we again review for plain error.

A constructive amendment to an indictment is constitutionally problematic because "[t]he Fifth Amendment's Grand Jury Clause provides that a defendant cannot be tried on charges that are not made in the indictment." *United States v. Griffin*, 76 F.4th 724, 736 (7th Cir. 2023). "A constructive amendment of an indictment occurs when the evidence at trial goes beyond the parameters of the indictment in that it establishes offenses different from or in addition to those charged by the grand jury." *United States v. Chaoqun*, 107 F.4th 715, 727 (7th Cir. 2024) (quoting *United States v. Shields*, 789 F.3d 733, 742 (7th Cir. 2015)).

To constitute a constructive amendment, "the crime charged in the indictment must be materially different or sub-

stantially altered at trial, so that it is impossible to know whether the grand jury would have indicted for the crime actually proved." *Id.* (citation modified). That said, "[e]vidence presented at trial that is different from that included in the indictment or presented to the grand jury does not constitute a constructive amendment of the indictment when the new evidence does not result in a different offense." *Id.*

Here, the government did not present a second scheme at trial, as Dorfman contends. To be sure, the government did introduce evidence that Dorfman "cover[ed] up what was really going on" from HII, the state directors of insurance, and the Better Business Bureau. Dkt. 178 at 178–79. But this evidence was introduced to establish Dorfman's knowledge and intent to defraud his customers—the focus of the government's case. As we have said, it is "long recognized that a defendant's attempt to conceal a crime is probative of a consciousness of guilt." *United States ex rel. Foster v. DeRobertis*, 741 F.2d 1007, 1013–14 (7th Cir. 1984); *see United States v. Jarigese*, 999 F.3d 464, 470 (7th Cir. 2021) (stating that efforts to conceal a defendant's unlawful actions is "direct evidence of the scheme charged").

Indeed, the government consistently took the position throughout the case and in its closing argument that the victims of Dorfman's fraudulent scheme were Simple Health's customers. *See, e.g.*, Dkt. 178 at 152 (expressing that the "evidence showed" that "the victims in this case were misled about the limited indemnity plans that they bought from" Simple Health); *id.* at 154 (referring to customers who testified as witnesses as "victims"); *id.* at 180 (describing customers as "the victims you heard from the last two weeks"); *id.* at 220 (referencing customers as "these victims"); *id.* at 222 (same).

In response, Dorfman points to the "materiality" jury instruction, which states that a false or fraudulent pretense, representation, promise, omission, or concealment is "material" if it is capable of influencing the decision of the "person *or entity* to whom it was addressed." Dkt. 139 at 30 (emphasis added). The "or entity" language, Dorfman posits, could have misled the jury into believing they could convict Dorfman for a scheme to defraud HII or regulators. But this is an overly myopic reading of the jury instructions.

Although the materiality instruction does include reference to "entity," the instructions that lay out the substantive elements of mail fraud and wire fraud both describe the relevant "scheme to defraud" as the scheme "described in Count 1." In much the same way, when defining a "scheme to defraud," the relevant instruction references "the portion of the indictment [that is, Count 1] describing the scheme." Count 1, in turn, portrayed the various ways that Simple Health's sales staff deceived customers, noting that the company "sold health insurance products to *more than 400,000 individuals*" and that "*[t]he victims* were located in all fifty of the United States." Dkt. 2 at 9 (emphases added). Finally, when defining the word "knowingly," the court instructed the jury that "the defendant acted knowingly if you find beyond a reasonable doubt that he believed it was highly probable that *customers* of Simple Health were being deceived." Dkt. 139 at 24 (emphasis added).

Simply put, Dorfman's argument that the government pursued a fraud theory different from what the indictment described finds no support in the record. And it follows from this that a specific unanimity instruction was unnecessary.

*       *       *

For these reasons, the judgment is AFFIRMED.